INTERNATIONAL SERVICE INSURANCE COMPANY et al., Appellants,

v.

DALLAS ASSOCIATION OF INSURANCE AGENTS et al., Appellees.

No. 10884.

Court of Civil Appeals of Texas.

Austin.

Oct. 25, 1961.

Rehearing Denied Nov. 15, 1961.

Heard L. Floore, Fort Worth, O'Quinn, McDaniel & Randle, Howell Finch, Austin, Will Wilson, Atty. Gen., Fred B. Werkenthin, R. V. Loftin, Jr., Asst. Attys. Gen., for appellants.

Fulbright, Crooker, Freeman, Bates & Jaworski, W. H. Vaughan, Jr., Houston, Thompson, Coe, Cousins & Irons, Dallas, for appellees.

ARCHER, Chief Justice.

This is an appeal from a district court judgment setting aside an order of the State Board of Insurance, and enjoining appellants from operating thereunder. The order approved a guaranty bond filed for approval by appellant, International Service Insurance Company, designed to guarantee payment of losses under fire insurance policies of other insurers, including appellant Fort Worth Lloyds, in the event the latter should become insolvent, be placed in receivership, or fail to pay a final judgment on the policy within thirty days.

The suit was filed by appellees Dallas Association of Insurance Agents and Floyd West and Company. Additional insurance companies and agents associations intervened as plaintiffs below.

Separate briefs are filed by International Service and the State Board of Insurance.

The appeal is founded on seven points in the brief of International Service and are to the effect that the Court erred in failing to dismiss the case where appellees failed to seek relief from the Board before filing the suit; in permitting various trade associations to maintain the suit in which they had no justiciable interest; in holding that the guaranty bond form is not a guaranty bond but is a fire insurance policy; in substituting its judgment for that of the Board; in holding that approval of the guaranty bond would permit International Service to issue fire insurance policies at unregulated rates; and in holding that the Board's approval of the guaranty bond permitted unlawful discrimination.

The Board assigns as error the action of the Court in construing the guaranty agreement as a policy of insurance, thereby substituting its discretion for that of the Board and in setting aside the order of the Board, the law and the substantial evidence supporting such order.

This suit attacks order No. 2686 of the Board, which approved a guaranty bond form, together with rules and rates to be used by International in writing such bonds.

International filed its form, together with rules and rates applicable thereto on Decem-

ber 4, 1959. This filing was disapproved by the Board on December 22, 1959, by order No. 2144. International requested a rehearing, and after which rehearing the Board by its order No. 2586, dated July 19, 1960, rescinded its original order disapproving the filing and approved the bond form together with the rate and rules applicable thereto, and its order that is under attack in this suit.

The guaranty bond filed December 4, 1959 was under Subchapter B of Chapter 5 of the Insurance Code, and it is made under Art. 5.15(a), V.A.T.S. Art. 5.15(c) allows the Board thirty days to disapprove such filing if it does not meet the requirements. The filing was disapproved and International requested a hearing, and such was granted.

Art. 1.04(f) provides for a judicial review by a party at interest dissatisfied with any decision, etc. adopted by the Board, and makes provision for the filing of a suit after failing to get relief from the Board.

The guaranty bond form filed by International Service, which is what appears to be the controlling issue in this case, contains the following provision:

"1. If the Company shall fail to pay to the Named Beneficiary the full amount which the Named Beneficiary is entitled to receive and to retain under any such policy heretofore or hereafter issued by the Company in which the Named Beneficiary has an interest within the time and in accord with the terms and provisions set forth in such policy because the Company is unable to pay, is judicially declared to be insolvent, or is placed in receivership, and for such reason, or any combination thereof, fails to discharge its obligation, in whole or in part, the International Service Insurance Company agrees that it will immediately become liable for that part of such amount which the Company has failed to pay, and will make payment for such amount as it shall become liable for directly to the Named Beneficiary by check made payable to the policyholder and the Named Beneficiary ·as their interest may appear, subject, always, to the terms of such policy; provided, however, that this agreement shall not apply to any policy or group of policies providing a total amount of insurance on any one building of more than $—.——. The Company shall be deemed unable to pay, as that language is used in this paragraph, if a final judgment be rendered against it and such final judgment is not fully paid and discharged within thirty days after the same becomes final."

The Board's order reads:

"No. 2586
          Record of Official Action
                  of the
          State Board of Insurance
                Austin, Texas

"Date July 19, 1960

"Subject Considered: International Service Insurance Company— Guaranty Agreement Form and Rules and Rates Applicable Thereto

"General remarks and official action taken:

"On this date the State Board of Insurance reconsidered a filing by International Service Insurance Company dated December 4, 1959 of a Guaranty Agreement Form and rules and rates applicable thereto which was disapproved by the Board on December 22, 1959 under Board Order No. 2144.

"After careful consideration the Board now rescinds its Order of December 22, 1959 and hereby approves the filing by International Service Insurance Company as previously filed on December 4, 1959.

"A copy of the filing is attached hereto and made a part of the Order.

"The approval of this filing does not authorize companies to attach any form of Guaranty Agreement to policies of fire insurance until such a form as the company proposes to attach has been filed and approved by the Board under the provisions of Article 5:36 of the Texas Insurance Code.

"State Board of Insurance

"See below

"Penn J. Jackson, Chairman

"Prepared by:
"s/ H. R. Lacy
"Director
"Bond, Burglary and Plate Glass Property Casualty Division

"Robert W. Strain
"Robert W. Strain, Member

"Ned Price
"Ned Price, Member

"The majority of the Board, over my protest, has already approved a guaranty agreement filing for General Reinsurance Corporation, setting a precedent which must be followed. We cannot make fish of one and fowl of another. At least International Service Insurance Company has a Certificate of Authority to participate in the writing of fire insurance. For these reasons I join in this order.

"Penn J. Jackson, Chairman."

We believe the prime question in this case is one of law and determination must be made as to the legal effect of the instrument as being a guaranty bond or a fire insurance policy which was improperly filed and approved by the Board.

We believe that the agreement is one of guaranty and is not an insurance policy subject to Board regulation as to rates.

The agreement to be issued by International Service for delivery to the insured owner or mortgagee of property primarily insured by another insurance company against fire and extended coverage provides that if the guaranteed company fails to discharge its liability because it is "unable to pay, is judicially declared to be insolvent, or is placed in receivership," International Service will pay the loss. Liability on the guaranty bond comes into existence when there is inability to pay a final judgment or a failure to pay such judgment.

Appellees take the position that the agreement is a fire insurance policy and cannot be issued unless the form is promulgated under Subchapter C of Chapter 5, of the Insurance Code.

There are some fire insurance companies whose premium rates are regulated by the Insurance Board by authority of Subchapter C, of Chapter 5 of the Insurance Code; others are not regulated, such as County Mutual and Lloyds Associations being exempt. In this case International Service is a regulated company and Fort Worth Lloyds is a nonregulated company.

Reinsurance between two Fire Insurance Companies is a usual if not a universal practice. In some instances reinsurance has been coupled with a direct contract between the reinsuring company and the insured with the existence of such 100 per cent reinsurance being pointed out by an indorsement on the face of the policy, together with a provision giving the insured a direct right of action against the reinsurer and in such case the reinsurer had issued a policy of direct insurance and must charge premium rates promulgated by the Board.

As we have stated, the instrument is a guaranty agreement. It is possible that many fire losses could occur without any liability arising on the bond. The liability on the bond is contingent on failure to pay an established loss or insolvency, on the part of the original insurer, and the amount that such insurer is unable to pay becomes the amount of liability on the bond. The bond may be compared to a performance

bond or guarantee and more properly regulated under Subchapter B of Chapter 5.

■ The Insurance Board has the responsibility of administering the insurance laws and has the responsibility of determining the nature of the contract.

Board of Insurance Commissioners v. Title Insurance Association of Texas, 153 Tex. 574, 272 S.W.2d 95.

The agreement form, hereinabove set out in part, which was approved by the Board, sets out and limits the liability of International Service to the failure of the guaranteed company to discharge its liability because it is "unable to pay, is judicially declared to be insolvent, or is placed in receivership"; the occurrence of such event or events, International Service will pay the loss.

Art. 5.25 et seq. of the Code, authorizes the Board to promulgate rates of premiums to be charged and collected for contracts or policies of "fire insurance" and to establish uniform fire insurance policies. Art. 5.26(a) provides the rate of premium which must be charged and collected by companies, unless the companies comply with the statutory procedure whereby lesser premiums may be charged. Art. 5.27 of the Code defines the type of insurance contract or policy over which the Board is given such power and authority to govern companies issuing contracts or policies of insurance against loss by fire, etc.

Commercial Standard Insurance Co. v. Board of Insurance Commissioners, Tex. Civ.App., 34 S.W.2d 343, er. ref.

■ In a fire insurance policy, as defined in Art. 5.27, the "loss" or "event" insured against is "the hazard of fire" or "loss by fire." This Texas statutory definition is in line with the generally accepted definition set out at 44 C.J.S. Insurance § 14, p. 477:

"Fire insurance or a fire insurance policy in the sense of its subject matter is a contract of indemnity by which an insurer, for a consideration, agrees to indemnify insured against loss of, or damage to, property by fire."

Arts. 2.02 and 8.01 of the Code authorize the organization of insurance companies to conduct the business of fidelity, guaranty and surety insurance, and the writing of such is regulated by Art. 5.13 et seq., which authorizes the companies to file premium rates and forms with the Board, who may approve or disapprove of these rates and forms.

■ Guaranty insurance is defined as:

"* * * a contract whereby one, for a consideration, agrees to indemnify another against loss arising from the want of integrity, fidelity, or insolvency * * * or against other breaches of contract; the business of guaranteeing the * * * performance by persons, firms, and corporations of contracts, bonds, recognizances, and other undertakings." 44 C.J.S. Insurance § 16, p. 479.

also

"The contract of guaranty is an undertaking or promise on the part of one person which is collateral to a primary or principal obligation on the part of another, and which binds the obligor to performance in the event of nonperformance by such other, the latter being bound to perform primarily." 24 Am.Jur., Guaranty, p. 873; 9 Appleman, Insurance Law, Sec. 5273.

■ Texas Jurisprudence defines "guaranty" as "* * * a promise of one person to perform an act * * * another is contractually bound to the promisee to perform, or a promise to pay compensation for the other's nonperformance, the promise being conditioned upon the latter's non-fulfillment of his duty * * * [it] is a collateral and secondary contract * * *" 27 Tex.Jur.2d, Sec. 1, p. 279.

Each fire insurance company applying for a certificate of authority to transact

business in Texas is required under Art. 6.09 of the Code to give security for the performance of its contracts in Texas. If a bond is made, the condition of the liability is "that said company will pay all its lawful obligations to the citizens of this State," and such bonds shall be subject to successive suits, etc.

The bonds under Art. 6.09 are on forms and rates approved by the Board.

We do not believe that the approval of the guaranty bond would permit International Service to issue fire insurance policies at unregulated rates.

The contention of appellees basically is that International Service, being a regulated company as to fire rates, is illegally permitted through the guaranty of policies of companies unregulated as to fire rates to thereby write fire insurance at unregulated rates.

In the instant case, the competition is for a class of highly profitable insurance on government housing. Much of the business was placed through cooperative placement bureaus and the premiums were divided among the members of trade associations. The Federal Housing Authority required the local Housing Authority to purchase fire insurance on a competitive bid basis from any qualified company, and the business became open to "deviators" and "unregulated companies." In order to meet claimed inadequacies in financial structure of certain deviators or unregulated companies caused Fort Worth Lloyds, an unregulated company as to fire rates, to secure financial backing of its affiliate, International Service, in providing additional assurance that its commitment on housing projects would be met.

The guaranteed company under the approved bond may be one selling its fire insurance for the maximum rate permitted. Another guaranteed company may sell fire insurance at less than the manual rate, as permitted on Board approval under Art. 5.26, and is called a deviating company.

Other companies may sell fire insurance at any rate they choose because they are not subject to rate regulation as to fire insurance and are referred to as "exempt" companies.

All companies generally are regulated as to policy forms, provisions for solvency, fair practices, etc.

Appellees have made counterpoints to the effect that the Trial Court did not err in holding order No. 2586 invalid; that appellees exhausted their administrative remedies prior to filing suit; that Dallas Association has a justiciable interest and is a proper party and if error, such is harmless.

Appellees in their brief say that for all practical purposes a law question is presented and is not a fact issue.

Appellees take the position that since Fort Worth Lloyds has assets of approximately $750,000 or a little more and that the inducement to buy fire insurance in Fort Worth Lloyds is not the solvency and financial size of Fort Worth Lloyds, but is the guaranty issued by International Service and that such agreement is tied to a reinsurance treaty. The further position is taken that if the agreement is a collateral fire insurance policy then the order is void, but that if the Guaranty Agreement is a Guaranty Bond then the Board's order is valid.

The record in this appeal is long and careful consideration has been given to it and to the cited authorities.

In view of our holding that the Guaranty Agreement is a Guaranty Bond, it is not necessary to pass on the assignments directed to procedural matters.

We do not believe that the Board was arbitrary and capricious in approving the filing under Subchapter B of Chapter 5. We believe that the Trial Court erred in holding the order involved herein invalid and void.

The judgment of the Trial Court is reversed and judgment is here rendered in favor of the appellants upholding the Board's order No. 2586.

Reversed and rendered.

HUGHES, Justice (dissenting).

Believing that the agreement in suit is in essence and substance an agreement absolutely fixing the liability of the obligor, International, to compensate insureds for losses resulting from fire, I respectfully dissent.

Companies engaging in the fire insurance business in this State must, unless exempted by law or unless the right to deviate (sell for less) has been authorized by the Board, charge and collect premiums which have been "exclusively fixed and determined and promulgated by the Board * * *." Art. 5.26, Insurance Code.

Appellant Fort Worth Lloyds is exempt from this statutory provision. Sec. (h) Art. 5.26, Insurance Code.

Appellant International Service Insurance Company, referred to infra as International, is not exempt from such statute, and it has not procured authority from the Board to charge a less premium than the Board has promulgated.

Fort Worth Lloyds sells fire insurance for premiums less than those fixed by the Board.

For background, and to make this dissent more intelligible, I quote and adopt the following uncontroverted portion of the brief for appellees:

"Several years ago, a practice grew up under which a small insurance company, 100% reinsured by a larger company, would issue its fire insurance policies to the members of the public; attached to those policies would be language, under the terms of which the policy holder was not only notified of the fact of reinsurance but, giving to the holder of the policy a direct right of action against the reinsuring company. In the record, these agreements are called 'Reinsurance Assumption Certificates.'

"A number of the companies so issuing policies which were guaranteed by another company were companies which were either exempt from rate regulation or had been granted rate deviations. Normally, the company which guaranteed the issuing company's policy would not have a deviation or be exempt. Thus, company A (the deviating or exempt company) was issuing policies of insurance at a rate different from or lesser than the power of the reinsuring company to issue.

"When this practice was called to the attention of the State Board of Insurance, it asked for and obtained an opinion of the Attorney General of the State of Texas.

"In substance, Attorney General's opinion WW533 ruled that the practice was illegal when the exempt or deviating company was being reinsured by a company that was not exempt or deviated. As a result, first the Commissioner of Insurance, and then the State Board of Insurance prohibited the practice.

"Thereafter, Appellants and others, in order to achieve the same purpose, devised what has now become to be known as the 'Guaranty Agreement' or 'Guaranty Bond.' A reading of the entire examination of Mr. Frank Roberts, the Chief Executive Officer of Appellant Insurance Company makes it clear that the purpose of the Guaranty Agreement is exactly the same. However, we call your attention to Mr. Robert's testimony:

"'Q. Now, the vehicle that you speak of has been available in one form

or another—and I think Mr. Floore used "changed in some of its aspects" prior to April of 1959, was the reinsurance certificate, wasn't it? A. Yes, sir.

" 'Q. And that was the vehicle you used until the Board ordered you to cease and desist—ordered all companies to cease and desist from that practice, isn't it? A. Right.

" 'Q. And this vehicle you are using now by way of a Guaranty Bond takes the place of, and as far as you are concerned, the purpose is identical with the use of the reinsurance certificate; isn't that correct? A. I would say that it is in a modified form.

" 'Q. But the purpose for which you intended is identical; isn't that correct? A. I would say generally speaking, yes.'

\*    \*    \*    \*    \*    \*

"It was admitted that International Service Insurance Co. and Fort Worth Lloyds are under common management. The undisputed record established that there is a substantial identity of ownership and management in the two companies. It was further admitted that the total assets of Fort Worth Lloyds are approximately $750,000.00 or a little more.[1]

"It is abundantly clear that with a company of the size of Fort Worth Lloyds, the inducement to buy fire insurance in Fort Worth Lloyds is not the solvency and financial size of Fort Worth Lloyds but the guaranty issued by the stock company, International Service Insurance Company. For example, we call attention to the following testimony from Mr. Angus Mc-Donald,  long time staff member of the State Board of Insurance:

" 'Q. And please tell us whether or not the inducement to the mortgagee is not the fire policy, but the guaranty bond, the so-called guaranty bond? A. Yes, sir.

" 'Q. And is that guaranty of payment present in the ordinary reinsurance situation, where one company reinsured part of its risk with another? A. No, sir.'

"That the Guaranty Agreement is tied hand in glove to a reinsurance treaty, we invite the attention of this Court to the following testimony from Mr. Frank Roberts, the proponent of the Guaranty Agreement:

" 'Q. Would your company issue a Guaranty Agreement in favor of any company with which it did not have a reinsurance contract? A. No, sir.

" 'Q. So then it is safe to say, then, that as far as you are concerned, at least, that the Guaranty Agreement is necessarily tied to reinsurance? A. Well, I wouldn't say it is tied to, but I would say it would be suicide to issue one that you don't know anything about their insurance program, reinsurance program.' "

The agreement in suit has been set out in the Court's opinion and will not be restated here. By its terms, if the "beneficiary" of the agreement sustains a fire loss, and the Company issuing the fire insurance policy is "unable to pay" the loss or is declared insolvent or placed in receivership, then International promises to pay the "beneficiary" the amount of his loss under the policy of insurance. "Unable to pay" is defined as any failure to pay within thirty days of a final judgment.

The brief of the Attorney General herein on behalf of the State Board of Insurance is predicated solely, as I understand it, on the assumption that "insolvency" of the

---

1. The assets of International Service were shown to be about $10,000,000.

insurer is required to activate liability under the agreement. I quote from its brief:

"Those who consider the instrument to be a guaranty agreement, as it purports to be, point to the fact that a hundred fires could occur without a single instance of liability arising on the bond; that the contingency which triggers liability on the bond is insolvency on the part of the insurer; that the amount that the insurer is unable to pay to the insured because of its insolvency is the amount of liability on the bond and hence, that the amount of fire loss does not necessarily determine the liability. * * *

"Numbered among those who consider the instrument as a guaranty bond is the State Board of Insurance.

\* \* \* \* \* \*

"The filing provides 'If the company shall fail to pay [because of insolvency] to the named beneficiary the full amount which the named beneficiary is entitled to receive * * * the International Service Insurance Company agrees that it will immediately become liable for that part of such amount which the company has failed to pay * * *

\* \* \* \* \* \*

"It is the position of the State Board of Insurance that the risk insured against in this case is insolvency of the insurer. The fire risk is insured by virtue of the fire insurance policy. By the guaranty agreement the insured is protected against the insolvency of the fire insurer."

This same assumption also appears to have been the basis of the conclusion reached by Board member, Dr. Robert W. Strain. I again quote from the Board's brief:

"Dr. Strain, Board member and well-known insurance expert, whose qualifications in this field are set out on pages 304, 305 and 306, Statement of

Facts—Temporary Injunction, testified that in his opinion the instrument was a guaranty bond. This opinion was based on the fact that two contingencies must exist before the guarantor is liable to pay under the agreement.

" 'The first contingency is the occurrence of a fire loss and the arising of an obligation between the policyholder and the fire insurer. The second contingency is the arising of insolvency on the part of the fire insurer. Those two contingencies, if they occur, make the guarantor liable under the guaranty agreement.'

" 'The actual liability, as pointed out by Dr. Strain, accrues "only when the second contingency arises, insolvency of the fire insurer." In effect it is analogous to the typical performance bond; this being the basis under which Dr. Strain regards the guaranty agreement as a bond—"the fact that it is hinged on the failure of the fire insurer to perform, by virtue of the failure being defined as insolvency." ' "

If these assumptions were sustained by the terms of the agreement, I would not have my present difficulty.

My concern, and the point of my dissent, is that the artificial definition given in the agreement for the words "unable to pay" makes for all practical purposes, an absolute and primary obligation on the part of International to pay all losses under policies issued by Fort Worth Lloyds.

No execution that I know of could be satisfied within thirty days after final judgment. The liability of International would attach before the ordinary execution could be satisfied. It would also seem to me that if this definition is controlling, that any definition of inability to pay, such as one based simply on a refusal to pay, would be just as valid and controlling.

Failure to pay an obligation may or may not connote inability to pay.

In Art 5.27 of the Insurance Code the Legislature very plainly stated its intent in legislating in this area stating:

"It being intended that every contract or policy of insurance against the hazard of fire shall be issued in accordance with the terms and provisions of this sub-chapter."

I believe that the contract here insures against the hazards of fire, and that it is subject to regulation under the laws relating thereto.

Art. 5.13 of the Insurance Code, being the first article in Subchapter B of Chapter 5 which regulates Casualty Insurance and Fidelity, Guaranty and Surety Bonds provides, in part, that such regulations do not apply to "the writing of * * * fire * * insurance."

This exclusion is significant in that it evidences a legislative intent to distinguish between fire insurance and the writing of guaranty bonds. It would also seem to give preference to the former over the latter if there was any overlapping.

I readily concede that the agreement here has some of the characteristics of a guaranty. In McCormick Harvesting Mach. Co. v. Millett, 29 S.W. 80, the Dallas Court of Civil Appeals in considering an agreement to pay a note if not paid by the maker within sixty days after maturity the Court held that this form of guaranty "absolutely fixed" the liability of the guarantor to pay upon the failure of the maker of the note to pay as stipulated.

In Arnett v. Simpson, Tex.Civ.App., 235 S.W. 982, 985, writ dismissed, the Court in discussing the law of guaranty quoted approvingly a textbook statement that "A guarantor insures the solvency of the debtor."

In the agreement here, liability of International to pay an accrued claim under a fire insurance policy is not contingent upon insolvency of Fort Worth Lloyds. It is contingent only on the passage of time (30 days), and since time always passes, the liability to pay is absolute. This is the same and the only liability which an insurer has, except for the thirty day delay which is of no practical significance.

I would affirm the judgment of the Trial Court.